BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
ERICH P. SCHORK
JEFFREY D. BLAKE
ANTHONY L. PARKHILL
One North LaSalle Street, Suite 4600
Chicago, IL  60602
Tel: 312/621-2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
e.schork@barnowlaw.com
j.blake@barnowlaw.com
aparkhill@barnowlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA IRON WING and RYAN MCGRATH, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br><br><br>**JURY TRIAL DEMANDED** |

BLOOD HURST & O'REARDON, LLP

00134074

Case No.

Plaintiffs Joshua Iron Wing and Ryan McGrath ("Plaintiffs"), on behalf of themselves and all others similarly situated, upon personal knowledge as to facts pertaining to themselves and on information and belief as to all other matters, by and through undersigned counsel, bring this class action complaint against defendant Facebook, Inc. ("Facebook").

## NATURE OF THE ACTION

1.      This class action stems from Facebook's breach of its duty to protect its users' private communications and information. Between April 21, 2010, and April 30, 2015 (the "Relevant Time Period"), Facebook's social media platform was specifically designed to facilitate the development of third-party apps capable of harvesting Facebook user data of not just the app's user, but also the Facebook data of each of that app user's Facebook friends (the "Friends Data Scrape Feature"). This feature allowed third parties to harvest the private Facebook data of tens (if not hundreds) of millions of Americans without their knowledge or consent.

2.      Cambridge Analytica is one of those third parties. In advance of the 2016 election in the United States, Cambridge Analytica hired Aleksandr Kogan, an academic at Cambridge University, and Kogan's company, Global Science Research, to procure the data of "as close to every US Facebook user . . . as possible."[1] To accomplish that goal, Kogan built a Facebook app entitled, "thisisyourdigitallife."

3.      Between June 2014 and August 2014, approximately 300,000 Facebook users were induced to download the "thisisyourdigitallife" app, enabling Kogan and Cambridge Analytica, through use of the Facebook Friends Scrape Feature, to harvest the Facebook profile data of approximately 70 million Americans. The app users' Facebook friends were never notified that their private Facebook profile information was being harvested by a third party.

---

[1]      Harry Fox Davies, The Guardian, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users* (Dec. 11, 2015) https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data (last visited Mar. 30, 2018).

BLOOD HURST & O'REARDON, LLP

1                    Case No.
CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

1

2

3

4

5

6

4.      Cambridge Analytica is only the most sensational and widely-publicized example of this practice, but there are many more app developers who were similarly able to obtain massive amounts of information without the consent of the owners of the information and without any meaningful oversight by Facebook. This case is about Facebook's data sharing practices with all third-party app developers until changes were imposed in April 2015.

7

8

9

10

11

5.      This "breach of trust" by Facebook, as Founder and CEO Mark Zuckerberg has recently described it, was originally designed, sanctioned, and encouraged by Facebook. Indeed, Facebook had reiterated its opinion as recently as 2017 that "no wrongdoing" occurred in the Cambridge Analytica incident. Privacy is the enemy of the goals of Facebook and its pervasive activity here exemplifies that fact.

12

13

14

15

16

17

6.      During the Relevant Time Period, a Facebook user's profile may have included the user's first and last name, personal messages to friends, gender, birthdate, relationship status, employment history, educational history, interests, activities, games, religion/politics, hometown, location check-in information, a short "about me" description, photographs and videos uploaded by the user, photographs and videos in which the user was tagged in, a list of the user's Facebook friends, communications by the user (wall posts), likes, and other content.

18

19

20

21

22

23

7.      It is now too late to wind back the clock and undo what has been done. Facebook cannot retrieve, delete, or destroy the data acquired by these third-party apps. According to one forthcoming app developer who had user data foisted upon him by Facebook, "Facebook rammed their data down our throats. On the whole, none of us asked for your data. But we have it anyway, and forever."[2] The risk in that possession of information, once private, is evident and exists for purchasers of such companies.

24

///

25

///

26

27

28

---

[2]      Ian Bogost, The Atlantic, *My Cow Game Extracted Your Facebook Data*, (Mar. 22, 2018), https://www.theatlantic.com/technology/archive/2018/03/my-cow-game-extracted-your-facebook-data/556214/ (last visited Mar. 30, 2018).

8.      Plaintiffs bring this lawsuit on behalf of themselves and similarly situated persons whose nonpublic Facebook data, which comprise personal information, personally identifiable information regarding prerecorded video content, and the contents of electronic communications, was communicated to a third party using the Friends Data Scrape feature.

9.      Plaintiffs and the other Class members seek redress against Facebook for its violations of the Stored Communications Act (the "SCA"), 18 U.S.C. §§ 2701, *et seq.*, the Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. §§ 2510, *et seq.,* the Video Privacy Protection Act (the "VPPA"), 18 U.S.C. §§ 2710, *et seq.*, invasion of privacy, negligence, and violation of California's Invasion of Privacy Act, Cal. Penal Code § 637.7, and Plaintiffs' and the other Class members' constitutional rights of privacy.

10.     Plaintiffs, on behalf of themselves and the other Class members, seek: (i) actual, nominal, and statutory damages; (ii) disgorgement of Facebook's profits, (iii) exemplary and punitive damages for its willful, intentional, and purposeful conduct, and its conscious disregard for the wellbeing of its users; and (iv) attorneys' fees, litigation expenses, and costs.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331, because Plaintiffs' claims arise out of the laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' claims arising out of state law pursuant to 28 U.S.C. § 1367.

12.     The Court may exercise jurisdiction independently over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(d), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     The Court has personal jurisdiction over Facebook because Facebook maintains its principal place of business within the State of California.

14.     Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims emanated from activities within this District and Facebook conducts substantial business in this District.

**PARTIES**

15.     Plaintiff Joshua Iron Wing is a citizen of the State of Kansas. He has been a Facebook user since before April 2010. He lived in Florida from prior to April 2010 until September 2012, in Nevada from September 2012 to September 2014, and in California from September 2014 to the end of the Relevant Time Period. As a condition of his employment during certain portions of the Relevant Time Period, Iron Wing was required to and did limit who could view certain information in his Facebook profile. On information and belief, it is believed Iron Wing's private profile information was accessed by third parties via Facebook's Friends Data Scrape Feature.

16.     Plaintiff Ryan McGrath is a citizen of the State of Colorado. He has been a Facebook user since before April 2010. He lived in Illinois from prior to April 2010 until March 2012, and in Colorado from March 2012 to the end of the Relevant Time Period. During the Relevant Time Period, McGrath limited who could view certain information in his Facebook profile. On information and belief, it is believed that McGrath's private profile information was accessed by third parties via Facebook's Friends Data Scrape Feature.

17.     Facebook, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

**FACTUAL ALLEGATIONS**

18.     With over 2 billion users, Facebook's website, www.facebook.com, is the World's most popular social media platform, allowing users to create an account and interact with friends. A Facebook profile is a personal account of an individual Facebook user.

19.     Facebook represented that users could restrict access to certain information. For example, users could designate a wall post as sent only to his or her Facebook friends.

///

///

BLOOD HURST & O'REARDON, LLP

4                    Case No.

CLASS ACTION COMPLAINT

20.     Facebook's Graph API, launched in April 2010, was a developer, or app-level, interface which, through the Friends Data Scrape Feature, allowed third parties to collect enormous amounts of Facebook users' profile data, regardless of whether it was designated private or public.

21.     Facebook encouraged and facilitated the development of third-party apps for its platform to generate more activity, user data points, and opportunities to deliver advertisements. Facebook would provide the integration and distribution through its social graph, and developers would provide the applications. Facebook maintains a website to provide instructions and support for such app developers at https://developers.facebook.com/.

22.     Facebook endorsed these third-party apps and gave them its imprimatur, imbuing them with a patina of Facebook's immense goodwill. Facebook displayed information about a user's friends playing games, taking quizzes, or using apps through Facebook, in an attempt to persuade the user to play or participate as well.

23.     The table below[3] shows the categories of information that were accessible to third-party app developers through Facebook's Graph API Version 1, which was in use from April 2010 until April 2015:

///

///

///

///

///

---

[3]     Iraklis Symeonidis, et al., Collateral damage of Facebook Apps, available at https://eprint.iacr.org/2015/456.pdf (last visited Mar. 30, 2018).

BLOOD HURST & O'REARDON, LLP

00134074

BLOOD HURST & O'REARDON, LLP

| Basic Info (default) | Extended Profile Properties (xpP) | | Extended Permissions (xP) |
|---|---|---|---|
| | User Data | Friends Data | |
| uid | user_about_me | friends_about_me | ads_management |
| name | user_actions.books | friends_actions.books | ads_read |
| first_name | user_actions.music | friends_actions.music | create_event |
| last_name | user_actions.news | friends_actions.news | create_note |
| link | user_actions.video | friends_actions.video | email |
| username | user_activities | friends_activities | export_stream |
| gender | user_birthday | friends_birthday | manage_friendlists |
| locale | user_checkins | friends_checkins | manage_notifications |
| age_range | user_education_history | friends_education_history | manage_pages |
| | user_events | friends_events | photo_upload |
| | user_friends | friends_games_activity | publish_actions |
| | user_games_activity | friends_groups | publish_checkins |
| | user_groups | friends_hometown | publish_stream |
| | user_hometown | friends_interests | read_friendlists |
| | user_interests | friends_likes | read_insights |
| | user_likes | friends_location | read_mailbox |
| | user_location | friends_notes | read_page_mailboxes |
| | user_notes | friends_online_presence | read_requests |
| | user_online_presence | friends_photo_video_tags | read_stream |
| | user_photo_video_tags | friends_photos | rsvp_event |
| | user_photos | friends_questions | share_item |
| | user_questions | friends_relationship_details | sms |
| | user_relationship_details | friends_relationships | status_update |
| | user_relationships | friends_religion_politics | video_upload |
| | user_religion_politics | friends_status | xmpp_login |
| | user_status | friends_subscriptions | |
| | user_videos | friends_website | |
| | user_website | friends_work_history | |
| | user_work_history | | |

24.     As the above table shows, third-party apps were able to harvest significant personal information of an app user's Facebook friends using the Friends Data Scrape Feature, including but not limited to: basic information, books they read, music they listened to, news, videos they watched, their activities, birthdays, photos, online presence, their likes, interests, statuses, and work history.

25.     Facebook employed insufficient and unreasonably lax restrictions and protections to secure user data. Although purporting to require apps to publish a Privacy Policy, Facebook did not implement a robust or reasonable audit, monitoring program, or certification process to ensure third-party apps were acquiring data in legitimate ways and for legitimate reasons. Instead, Facebook invited third-party apps onto its platform and taught them how to build apps with the prospect of obtaining vast amounts of user data.

6                    Case No.

CLASS ACTION COMPLAINT

26. Third-party app developers accepted the invitation. Tens or possibly hundreds of thousands of apps were developed. Some app developers created hundreds of apps with the purpose of obtaining the data of as many Facebook users as possible.

27. Facebook promised users that apps were only using data they needed to operate. That was false. In reality, the third-party apps were able to and did scoop vast amounts of freely available data the apps did not need for myriad purposes including those which are unsavory, nefarious, and malicious. According to one data expert, Facebook is "abusive by design."[4]

28. In 2009, Zuckerberg promised, "Facebook will never sell your information without consent." Instead, Facebook designed a platform that enabled anyone to take what data they wanted without consent or transparency regarding the extent of Facebook's data sharing practices. According to one app developer, "We ingested the entire U.S. social graph . . . . We would ask permission to basically scrape your profile, and also scrape your friends, basically anything that was available to scrape. We scraped it all."[5]

### The Cambridge Analytica Data Breach

29. Cambridge Analytica is the most widely reported example of that. On March 16, 2018, in an announcement Facebook made in anticipation of news reports that Facebook user data was being misappropriated and analyzed for political purposes, Facebook admitted that its third-party app data sharing practices were being used in ways that posed grave risks for users.[6] Facebook announced the suspension of certain third-party app developers and their

---

[4] Carole Cadwalladr, The Guardian, 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower (Mar. 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump (last visited Mar. 30, 2018).

[5] Elizabeth Dwoskin and Tony Romm, The Washington Post, Facebook's rules for accessing user data lured more than just Cambridge Analytica, https://www.washingtonpost.com/business/economy/facebooks-rules-for-accessing-user-data-lured-more-than-just-cambridge-analytica/2018/03/19/31f6979c-658e-43d6-a71f-afdd8bf1308b_story.html?utm_term=.97fc50276c8a (last visited Mar. 30, 2018).

[6] Paul Grewal, Facebook Newsroom, Suspending Cambridge Analytica and SCL Group from Facebook (Mar. 16, 2018), https://newsroom.fb.com/news/2018/03/suspending-cambridge-analytica/ (last visited Mar. 30, 2018).

BLOOD HURST & O'REARDON, LLP

00134074

conspirators, including Cambridge Analytica, charging that they "lied to us and violated our Platform Policies by passing data from an app."

30.    In a March 21, 2018, Facebook post, Mark Zuckerberg stated that in 2015, Facebook learned that Kogan was sharing data with Cambridge Analytica, in a way that Facebook considered a breach of Facebook policies.[7]

31.    Facebook allegedly "removed his app from Facebook and demanded certifications from Kogan and all parties he had given data to that the information had been destroyed." But, as one person who was required to provide the certification has said, "Facebook made zero effort to get the data back." "[L]iterally all I had to do was tick a box and sign it and send it back, and that was it."[8]

32.    After designing its application platform interface to allow for the unauthorized collection of Facebook user data on an industrial scale, Facebook discouraged its employees from looking into how third parties were using those tools. Sandy Parakilas, a former employee at Facebook stated that he previously warned Facebook about the problem of data leaking out of the company's third-party applications. He was told, reportedly: "Do you really want to see what you'll find? They felt it was better not to know," he said.[9]

33.    On March 21, 2018, Mark Zuckerberg confessed to a "breach of trust" with Facebook users, stating, "we have a responsibility to protect your data, and if we can't then we don't deserve it." Zuckerberg acknowledged that "the people who share their data with . . . [Facebook] expect us to protect it." He admitted, "we also made mistakes."

34.    According to Zuckerberg, Facebook will provide notification to persons whose data was obtained by Cambridge Analytica. In addition, Facebook provided assurances that it

---

[7]    https://www.facebook.com/zuck/posts/10104712037900071

[8]    Carole Cadwalladr, The Guardian, 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower (Mar. 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump (last visited Mar. 30, 2018).

[9]    Alexis C. Madrigal, The Atlantic, Zuckerberg Offers the Bare Minimum on the Cambridge Analytical Mess (Mar. 21, 2018), https://www.theatlantic.com/technology/archive/2018/03/zuckerberg-facebook-cambridge-analytica-statement/556187/ (last visited Mar. 30, 2018).

BLOOD HURST & O'REARDON, LLP

00134074

1   would investigate all apps that had access to large amounts of information before changes were

2   implemented, and conduct full audits of any app with suspicious activity. Further, Facebook

3   promises to ban any developer from the platform that does not agree to a thorough audit. If

4   developers misused personally identifiable information their apps will be banned.

5          35.     In an interview on CNN on March 21, 2018, Mark Zuckerberg explained, "the

6   good news here is that we already changed the platform policies in 2014, but before that, we

7   know what the apps were that had access to data. We know how much . . . how many people

8   were using those services, and we can look at the patterns of their data requests."[10] In the same

9   interview, Zuckerberg promised to review thousands apps, admitting that Facebook never

10  before checked to see what apps were doing with Facebook data, stating:

11         It's hard to know what we'll find, but we're going to review thousands of apps.
           So, I think this is going to be an intensive process, but this is important. I mean
12         this is something that in retrospect, we clearly should have done up front
           with Cambridge Analytica. We should not have trusted the certification that they
13         gave us. And we're not going to make that mistake again. And this is our
           responsibility to our community just to make sure that we secure the data that
14         they share.[11]

15

16         36.     Zuckerberg also stated that "it's clear now that we didn't focus enough on

17  preventing abuse and thinking about how people could use these tools for harm as well."

18         37.     Zuckerberg's representations that Facebook platform policies changed in 2014

19  was not the whole truth. In actuality, legacy apps then in existence were allowed an additional

20  year to transition to Facebook's more restrictive API Version 2.0. It was in April 2015 that

21  Facebook finally discontinued its sharing practices that underlie this lawsuit.

22         38.     In a 2014 news release, a Facebook executive wrote, "We've heard from people

23  that they are often surprised when a friend shares their information with an app." For an entire

24  year, Facebook knew apps were abusing Facebook's platform, decided it needed to be

25  changed, but permitted apps to make a final sweep of Facebook for its user's data.

26

27  ────────────

28  [10]     https://www.youtube.com/watch?v=G6DOhioBfyY video at 5:05.
    [11]     *Id.* at 6:00.

BLOOD HURST & O'REARDON, LLP

1      39.     On April 4, 2018, Facebook announced sweeping changes to its data protection

2   policies and procedures. Among these announcements was a revelation that Facebook was

3   ending a vulnerability in its search and account recovery procedures that enabled the scraping

4   of vast amounts of Facebook data. The vulnerability enabled Facebook profiles and

5   information to be easily searched using an email address or telephone number. Zuckerberg

6   commented on the extent and sophistication of such scraping activities, saying, "It is

7   reasonable to expect that if you've had that setting on in the last several years that someone

8   has accessed your information."

9      40.     According to U.S. Senate Commerce Committee member Sen. Ed Markey,

10   "The more we learn, the clearer it is that this was an avalanche of privacy violations that strike

11   at the core of one of our most precious American values – the right to privacy."

12   ***Plaintiffs and the Other Class Members Value Their Personal Information and the Ability***

13   ***to Control It***

14      41.     One need only reference Facebook's market capitalization to accept the

15   proposition that Plaintiffs and the other Class members' personal information, and the ability

16   to control it, has value. It is a truth on which the company is based and which enabled the

17   company to earn nearly $40 billion in 2017.

18      42.     Personal data also has value to businesses for other purposes, as well. For

19   example, price discrimination can be employed by merchants to enhance profits when the

20   seller knows more about potential buyers. In one famous case, an Amazon user was charged

21   one high price for a product before deleting his cookies, and one lower price for the same

22   product after deleting his cookies.[12] A New York Times article described other plausible

23   scenarios: "You might be refused health insurance based on a Google search you did about a

24   medical condition. You might be shown a credit card with a lower credit limit, not because of

25

26

27

28   [12]     https://en.wikipedia.org/wiki/Amazon.com_controversies#Differential_pricing   (last
visited Mar. 28, 2018).

BLOOD HURST & O'REARDON, LLP

00134074

your credit history, but because of your race, sex, or ZIP code or the types of Web sites you visit."[13]

43.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[14]

44.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency."[15]

45.     The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[16]

46.     Recognizing the high value that consumers place on their personal information, many companies now offer consumers an opportunity to sell this information. The idea is to

---

[13]     Lori Andrews, The New York Times, Facebook is Using You (Feb. 4, 2012), https://www.nytimes.com/2012/02/05/opinion/sunday/facebook-is-using-you.html?mtrref= www.google.com&gwh=236D386A9C442DF4B6EA2D91D72BEC5C&gwt=pay&assetType =opinion (last visited Mar. 30, 2018).

[14]     Federal Trade Commission Public Workshop, *The Information Marketplace: Merging and Exchanging Consumer Data*, available at https://www.ftc.gov/sites/default/ files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Mar.29, 2018).

[15]     *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Mar. 29, 2018).

[16]     *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207 privacyroundtable.pdf (last visited Mar. 29, 2018).

BLOOD HURST & O'REARDON, LLP

give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will receive fair market value for their information.[17] This business has created a new market for the sale and purchase of this valuable data.[18]

47.     As a result of Facebook's unlawful conduct, Plaintiffs and other Class members have suffered injury and damages, including, but not limited to: (i) an increased risk of identity theft and identity fraud; (ii) improper disclosure of their personal and private information, which is now in the hands of unknown and inadequately vetted app developers and their transferees; and (iii) the deprivation of the value of their personal information, for which there is a fair market value.

48.     Plaintiffs and the other Class members had Facebook data disclosed without their consent to unknown third parties by Facebook. Potentially thousands of third-party apps were able to procure massive amounts of their data without their knowledge or consent. Plaintiffs and the other Class members were the owners of their data. As a result of Facebook's unlawful conduct, Plaintiffs and the other Class members lost the ability to control their private and personal information, and they lost the value of the information to advertisers and businesses, a value that was obtained by someone else. The information Plaintiffs and the other Class members thought they were sharing with a limited audience was in actuality being surreptitiously disclosed to unknown third parties in a manner designed and directed by Facebook for commercial purposes.

49.     Plaintiffs and the other Class members were deprived of the ability to control with whom their communications and information were shared on Facebook and how widely those communications and data would be disseminated. They are now unable to retrieve the information already disclosed and must face the consequences of such disclosure, including but not limited to: increased risk of identity theft and identity fraud, being targeted by

---

[17]     Steve Lohr, *You Want My Personal Data? Reward Me for It*, The New York Times, http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited Mar. 29, 2018).

[18]     *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/ SB10001424052748703529004576160764037920274.html (last visited May 3, 2017).

00134074

advertisements and messages based on prior conduct, being profiled by merchants and other companies based on unknown and unknowable data and analyses, and living with the uncertainty about who possesses their data.

50.   Acknowledging the injuries sustained by Plaintiffs and the other Class members and the consequences thereof, Facebook has promised to secure data, and to provide transparency and full control for users going forward.

**CLASS ACTION ALLEGATIONS**

51.   Plaintiffs bring this case on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class ("Nationwide Class") defined as:

> All persons whose non-public Facebook data was communicated by Facebook to a third party using Facebook's Friends Data Scrape Feature.

Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

52.   In addition Plaintiff Joshua Iron Wing seeks certification of the following class of California residents ("California Class"):

> All persons whose non-public Facebook data was communicated by Facebook to a third party using Facebook's Friends Data Scrape Feature while said persons were California residents.

Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

53.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

BLOOD HURST & O'REARDON, LLP

54.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that joinder of all Class members would be impracticable. On information and belief, Class members number in the tens of millions.

55.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

    a.    Whether Facebook violated the SCA by knowingly divulging Plaintiffs' and the other Class members Facebook communications to third parties;

    b.    Whether Facebook violated the ECPA by intercepting the contents of Plaintiffs' and the other Class members' communications and disclosing such communications without their authorization;

    c.    Whether Facebook violated the VPPA by disclosing Plaintiffs' and the other Class members' personal information on videos watched to third parties;

    d.    Whether Facebook's disclosure of Plaintiffs' and the other Class members' Facebook data constituted a violation of their right to privacy;

    e.    Whether Facebook failed to use reasonable care and commercially reasonable methods to secure and safeguard Plaintiffs' and Class members' Facebook data;

    f.    Whether Facebook properly implemented its purported security measures to protect Plaintiffs' and Class members' Facebook data from unauthorized capture, dissemination, and misuse;

    g.    Whether Facebook violated Plaintiffs' and the other Class members' right to privacy under the California Constitution;

    h.    Whether Facebook violated the Invasion of Privacy Act by intercepting, accessing, and acquiring Plaintiffs' and the Class members' location and movement information without authorization; and

    i.    Whether Plaintiffs and the other Class members are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

56.    Facebook engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate in this action.

BLOOD HURST & O'REARDON, LLP

00134074

57.     **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through Facebook's uniform misconduct described above. Further, there are no defenses available to Facebook that are unique to Plaintiffs.

58.     **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

59.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate claims against Facebook, so it would be impracticable for Class members to individually seek redress for Facebook's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

///
///
///
///
///
///

BLOOD HURST & O'REARDON, LLP

00134074

15          Case No.

1

**COUNTS**

2

**COUNT I**

3

**Violations of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.***
**On Behalf of the Nationwide Class**

4

5       60.     Plaintiffs reassert and reallege paragraphs 1–59 as if fully set forth herein.

6       61.     Facebook is both an electronic communication service and a remote computing

7   service. An electronic communication service is defined as any service which provides to users

8   thereof the ability to send or receive wire or electronic communications, or any transfer of

9   signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole

10  or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects

11  interstate or foreign commerce. 18 U.S.C. § 2510 (12), (15). A remote computing service

12  means the provision to the public of computer storage or processing services by means of an

13  electronic communications system. 18 U.S.C. § 2711(a). Facebook sends, receives, stores, and

14  processes the wall posts, likes, comments, and all other Facebook activities and content of its

15  users.

16      62.     Facebook offers its electronic communication and remote computing services to

17  the public. In this capacity, Facebook offered services to Plaintiffs and the other Class

18  members.

19      63.     Facebook knowingly divulged the contents of communications of Plaintiffs and

20  the other Class members while in electronic storage to third parties in violation of 18 U.S.C.

21  § 2702(a) and § 2702(b). Facebook designed and constructed its platform and invited and

22  facilitated the use and acquisition of Facebook data by third-party app developers.

23      64.     Facebook knowingly divulged the contents of communications of Plaintiffs and

24  the other Class members without their lawful consent or the lawful consent of intended

25  recipients. Facebook had knowledge that it was disclosing information, and that such

26  information was being disclosed from the electronic storage of an electronic communication

27  service and remote computing service, and knew that its conduct would result in the disclosure

28  of the information and contents of communications of its users.

BLOOD HURST & O'REARDON, LLP

65.     Plaintiffs and the other Class members are "person[s] aggrieved" by Facebook's violations of the SCA "in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind." 18 U.S.C. § 2707(a).

66.     Each instance of Facebook's prohibited divulgence constitutes a separate and distinct violation of the SCA, subject to the remedies provided under the SCA, 18 U.S.C. § 2707.

67.     Plaintiffs and the other Class members are entitled to appropriate relief provided in § 2707(b), including preliminary and other equitable or declaratory relief as may be appropriate; damages assessed as the sum of the actual damages suffered plus any profits made by Facebook as a result of the violation, but in no case less than the sum of $1,000; and reasonable attorneys' fees and other litigation costs reasonably incurred.

68.     Plaintiffs' and the other Class members' actual damages include, but are not limited to: (i) an increased risk of identity theft and identity fraud; (ii) improper disclosure of their private information, which is now in the hands of unknown app developers and their transferees; and (iii) the deprivation of the value of their personal information, for which there is a fair market value.

69.     Facebook's conduct was willful, intentional, widely impactful, and egregious, such that an award of punitive damages is appropriate.

## COUNT II

**Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*
On Behalf of the Nationwide Class**

70.     Plaintiffs reassert and reallege paragraphs 1–60 as if fully set forth herein.

71.     Facebook is an electronic communication service. An electronic communication service is defined as any service which provides to users thereof the ability to send or receive wire or electronic communications, or any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. 18 U.S.C. § 2510 (12), (15). Over the Internet, Facebook sends, receives, stores,

BLOOD HURST & O'REARDON, LLP

1    and processes the users' posts, likes, status updates, private messages, comments, photos,

2    videos, and all other Facebook activities and content of its users.

3         72.     Facebook violated the ECPA by:

4              a.     Intentionally intercepting, endeavoring to intercept, or procuring other

5                     persons to intercept or endeavor to intercept wires and electronic

6                     communications;

7              b.     Intentionally disclosing, or endeavoring to disclose to other persons the

8                     contents of wires or electronic communications, knowing or having

9                     reason to know that the information was obtained through the

10                    interception of a wire or electronic communication in violation of the

11                    ECPA;

12             c.     Intentionally using, or endeavoring to use, the contents of any wire or

13                    electronic communication, knowing or having reason to know that the

14                    information was obtained through the interception of a wire or

15                    electronic communication; and

16             d.     Intentionally divulging the contents of communications while in

17                    transmission on Facebook's service to persons other than addressees and

18                    intended recipients of such communications.

19        73.     Facebook enabled third-party apps to subscribe to changes in data relating to

20   users in real time. By subscribing to these real time updates, the apps were able to and did,

21   cache data and receive updates from Facebook on data relating to users as they were made.

22        74.     Plaintiffs and the other Class members are "person[s] aggrieved" by

23   Facebook's violations of the ECPA because their wires and electronic communications were

24   intercepted by Facebook as a result of Facebook's conduct and Facebook and third parties

25   directed their interceptions against Plaintiffs and the other Class members.

26        75.     Each instance of Facebook's prohibited conduct constitutes a separate and

27   distinct violation of the ECPA, subject to the remedies provided under 18 U.S.C. § 2520,

28   including preliminary, equitable, and declaratory relief, damages assessed as the sum of the

BLOOD HURST & O'REARDON, LLP

actual damages suffered by Plaintiffs and the Class members plus any profits made by Facebook, or statutory damages of the greater of $100 a day for each day of violation or $10,000.

76.     Plaintiffs' and the other Class members' actual damages include, but are not limited to: (i) an increased risk of identity theft and identity fraud; (ii) improper disclosure of their private information, which is now in the hands of unknown app developers; and (iii) the deprivation of the value of their personal information, for which there is a fair market value.

77.     Facebook's conduct was willful, intentional, widely impactful, and egregious, such that an award of punitive damages is appropriate.

## COUNT III

**Violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710,** *et seq.*
**On Behalf of the Nationwide Class**

78.     Plaintiffs reassert and reallege paragraphs 1–57 as if fully set forth herein.

79.     Facebook is a video tape service provider because it is a person engaged in the business, in or affecting interstate and foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. 18 U.S.C. § 2710(a)(4). Facebook regularly displays a variety of video content to its users.

80.     Plaintiffs and the other Class members are consumers of Facebook because they are renters, purchasers, or subscribers of goods or services from Facebook.18 U.S.C. § 2710(a)(1).

81.     The Facebook data of Plaintiffs and the other Class members contained personally identifiable information, including information that identifies Plaintiffs and the other Class members as having requested or obtained specific videos.

82.     Facebook knowingly disclosed Plaintiffs' and the other Class members' personally identifiable information to third-party app developers in violation of the VPPA.

83.     Plaintiffs and the other Class members are "aggrieved person[s]" under the VPPA by Facebook's disclosure of their personally identifiable information, as alleged herein.

BLOOD HURST & O'REARDON, LLP

00134074

1    Therefore, Plaintiffs and the other Class members may bring an action under § 2710(c) against

2    Facebook.

3        84.    Plaintiffs and the other Class members may be awarded actual damages, but not

4    less than liquidated damages in an amount of $2,500, punitive damages, reasonable attorneys'

5    fees and other litigation costs reasonably incurred; and such other preliminary and equitable

6    relief as the court determines to be appropriate.

7                              **COUNT IV**

8                          **Invasions of Privacy**
9                  **On Behalf of the Nationwide Class**

10       85.    Plaintiffs reassert and allege paragraphs 1–60 as if fully set forth herein.

11       86.    Plaintiffs' and the other Class members' non-public Facebook data and the

12   contents of their communications constituted private facts.

13       87.    Facebook knowingly disclosed those private facts to third-party apps

14   developers, which potentially number in the thousands, such that the information can be

15   regarded as public knowledge.

16       88.    The sheer amount of information disclosed and the indiscriminate nature of the

17   disclosure was highly offensive to a reasonable person. A reasonable person would be

18   embarrassed and offended by the extent of the disclosure of such information to unknown third

19   parties.

20       89.    Facebook's conduct constituted an intrusion upon Plaintiffs' and the other Class

21   members' seclusion.

22       90.    Facebook's disclosure constitutes the public disclosure of private facts.

23       91.    Plaintiffs and the other Class members were harmed by Facebook's conduct

24   and the public disclosure of their private facts, as alleged herein. Plaintiffs' and the other Class

25   members' actual damages include, but are not limited to: (i) an increased risk of identity theft

26   and identity fraud; (ii) improper disclosure of their private information, which is now in the

27   hands of unknown app developers; and (iii) the deprivation of the value of their personal

28   information, for which there is a fair market value.

BLOOD HURST & O'REARDON, LLP

20                 Case No.
**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

**COUNT V**

**Negligence**
**On Behalf of the Nationwide Class**

92.     Plaintiffs reassert and reallege paragraphs 1–60 as if fully set forth herein.

93.     Facebook owed a duty to Plaintiffs and the other Class members to maintain reasonable safeguards and procedures to protect their data and to monitor the status and disposition of Plaintiffs' and the other Class members' data. Facebook has acknowledged these duties as described herein. Facebook has stated that it has a responsibility to protect and secure user data, and that users reasonably expect them to adequately safeguard their data.

94.     Facebook violated these duties and failed to reasonably safeguard Plaintiffs' and the other Class members' data. Facebook knowingly disclosed their information and communications to third-party apps in massive quantities without their consent.

95.     Facebook's violation of its duty caused Plaintiffs and the other Class members actual harm and damages. Plaintiffs' and the other Class members' actual damages include, but are not limited to: (i) an increased risk of identity theft and identity fraud; (ii) improper disclosure of their private information, which is now in the hands of unknown app developers; and (iii) the deprivation of the value of their personal information, for which there is a fair market value.

96.     Facebook's conduct was willful, intentional, widely impactful, and egregious, such that an award of punitive damages is appropriate.

**COUNT VI**

**Violations of the California Constitution, Article I, Section I**
**On Behalf of the California Class**

97.     Plaintiff Iron Wing reasserts and realleges paragraphs 1–60 as if fully set forth herein.

98.     Plaintiff Iron Wing and the other Class members have a specific, legally protected interest in the privacy of their Facebook user and other online data.

Case No.
CLASS ACTION COMPLAINT

00134074

99.   Plaintiff Iron Wing and the other Class members have reasonable expectations of privacy in their Facebook user and other online data.

100.   Facebook intentionally intruded upon Plaintiff Iron Wing's and the other Class members' seclusion and publicly disclosed private facts to unknown third parties without authorization or consent, as alleged herein.

101.   Facebook's invasion of privacy was highly offensive to a reasonable person. The sheer amount of information disclosed and the indiscriminate nature of the disclosure, as alleged herein, was highly offensive to a reasonable person. A reasonable person would be embarrassed and offended by the extent of the disclosure of such information to unknown third parties.

102.   Plaintiff Iron Wing and the other Class members were harmed by Facebook's invasions of privacy. As a result of Facebook's unlawful conduct, Plaintiff Iron Wing and the other Class members suffered actual damages including, but not limited to: (i) an increased risk of identity theft and identity fraud; (ii) improper disclosure of their private information, which is now in the hands of unknown app developers; and (iii) the deprivation of the value of their personal information, for which there is a fair market value.

103.   Plaintiff Iron Wing and the other Class members are entitled to actual damages, nominal damages, and punitive damages in an amount to be determined at trial.

## COUNT VII

### Violations of the California Invasion of Privacy Act, Cal. Penal Code §§ 637.7, *et seq*. On Behalf of the California Class

104.   Plaintiff Joshua Iron Wing reasserts and realleges paragraphs 1–60 as if fully set forth herein.

105.   Defendants used in California an electronic tracking device to determine the location or movement of Plaintiff Iron Wing and the other Class members by intercepting, accessing, and acquiring location data on Plaintiff Iron Wing's and the other Class members' Facebook profiles without authorization or consent.

BLOOD HURST & O'REARDON, LLP

Case No.

00134074

106.    Plaintiff Iron Wing's and the other Class members' Facebook profiles contained certain location data, including check-ins and friends' location data.

107.    Plaintiff Iron Wing's and the other Class members' smartphones and other computers contain electronic tracking devices. Location and movement information of Plaintiff Iron Wing and the other Class members was contained on their Facebook profiles and which was divulged by Facebook in violation of Cal. Penal Code § 637.7.

108.    Pursuant to Cal. Penal Code § 637.2, Plaintiff Iron Wing and the other Class members are persons injured by Defendants' violation of § 637.7. Plaintiff Iron Wing and the other Class members are entitled to monetary damages in the amount of either $5,000 or three times the amount of actual damages, if any; and an injunction on Defendants' violations of § 637.7.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Facebook as follows:

    i.    Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

    ii.    Ordering Facebook to pay actual damages to Plaintiffs and the Class members;

    iii.    Ordering Facebook to pay statutory damages and nominal damages, as allowable by law to Plaintiffs and the other members of the Classes;

    iv.    Ordering Facebook to pay punitive damages, as allowable by law, to Plaintiffs and the other members of the Classes;

    v.    Ordering Facebook to pay attorneys' fees and litigation costs to Plaintiffs;

    vi.    Ordering Facebook to pay both pre- and post-judgment interest on any amounts awarded; and

    vii.    Ordering such other and further relief as may be just and proper.

///

///

///

///

BLOOD HURST & O'REARDON, LLP

23                    Case No.

CLASS ACTION COMPLAINT

1

## JURY DEMAND

2      Plaintiffs, individually and on behalf of the other Class members, respectfully demand a

3  trial by jury on all claims so triable.

4                                              Respectfully submitted,

5  Dated: April 6, 2018                        BLOOD HURST & O'REARDON, LLP
                                               TIMOTHY G. BLOOD (149343)
6                                              THOMAS J. O'REARDON II (247952)
                                               PAULA M. ROACH (254142)
7

8                                              By:        s/ Timothy G. Blood
                                                         TIMOTHY G. BLOOD
9

10                                             501 West Broadway, Suite 1490
                                               San Diego, CA  92101
11                                             Tel: 619/338-1100
                                               619/338-1101 (fax)
12                                             tblood@bholaw.com
                                               toreardon@bholaw.com
13                                             pbrown@bholaw.com

14                                             BARNOW AND ASSOCIATES, P.C.
                                               BEN BARNOW
15                                             ERICH P. SCHORK
                                               JEFFREY D. BLAKE
16                                             ANTHONY L. PARKHILL
                                               One North LaSalle Street, Suite 4600
17                                             Chicago, IL  60602
                                               Tel: 312/621/2000
18                                             312/641-5504 (fax)
                                               b.barnow@barnowlaw.com
19                                             e.schork@barnowlaw.com
                                               j.blake@barnowlaw.com
20                                             aparkhill@barnowlaw.com

21                                             *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

24                          Case No.
                   CLASS ACTION COMPLAINT